**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IT'S A NEW 10, LLC, a Florida Limited Liability Company, | : | **ECF CASE** |
| | : | |
| Plaintiff, | : | Civil Action No.: 17-cv-4231 |
| v. | : | |
| | : | District Judge:  J. Paul Oetken |
| HARMON STORES, INC., A Delaware Corporation and BED, BATH & BEYOND, a New York Corporation, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | x | |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S**
**<u>ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................

I.      INTRODUCTION ............................................................................................1

II.     STATEMENT OF FACTS ...............................................................................3

     A.     Plaintiff Does Not Have Trade Dress Rights To Any Blue
            Body/Orange Top Bottle With A Circle Design....................................3

     B.     Defendants Designed Their Store Brand To Avoid
            Confusion With Plaintiff's Product .......................................................5

     C.     Defendants' Store Brand Has Been Displayed  And Sold
            Throughout Its Stores Since October 2015............................................6

     D.     Similar Designs For Hair Care Products Are Prevalent..........................7

III.    ARGUMENT ....................................................................................................8

     A.     The Preliminary Injunction Standard ....................................................8

     B.     Plaintiff Is Not Likely To Succeed On The Merits................................8

          1.     Plaintiff Does Not Have Broad Trade Dress Rights
               To A Color Combination .........................................................8

          2.     Defendants' HARMON[®] Face Values Conditioner
               Is Not Likely To Be Confused With Plaintiff's
               Products..................................................................................11

               a.     The Differences In The Trade Dresses Of The
                     Products Weighs Strongly Against A Likelihood Of
                     Confusion ...................................................................11

               b.     The Absence Of Actual Confusion Despite One
                     And One-Half Years Of Contemporaneous Display
                     And Sale Weigh Strongly Against A Likelihood Of
                     Confusion ...................................................................16

               c.     Defendants' Intent Was To Create A Store Brand,
                     Not To Cause Confusion.............................................17

                 d.     Plaintiff's Alleged Trade Dress Is Not A Strong
                     Mark ...........................................................................17

                 e.     Defendants' Product Is Of A High Quality...................18

           3.     Plaintiff Cannot Establish Confusion As To
                Association...............................................................................18

4.      Defendants Have Not Violated The New York
        Anti-Dilution Statute..............................................................19

C.      Plaintiff's Unreasonable Delay Undermines Its Contention
        of Irreparable Harm..............................................................20

D.      The Injury To Defendants From An Injunction Outweighs
        Any Injury To Plaintiff From Denial Of An Injunction ......................22

E.      The Public Interest Would Be Adversely Affected By An
        Injunction ..............................................................23

F.      If A Preliminary Injunction Is Entered, Plaintiff Must Post
        A Substantial Bond ..............................................................23

IV.     CONCLUSION..............................................................24

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*,
    513 F.2d 1183 (2d Cir. 1975)..................................................................................16

*Beverage Mktg. USA, Inc. v. South Beach Beverage Corp.*,
    36 Fed. Appx 1214 (2d Cir. 2002) .......................................................................11

*Braun Inc. v. Dynamics Corp. of Am.*,
    975 F.2d 815 (Fed. Cir. 1992)...............................................................................10

*Calvin Klein Co. v. Farah Mfg. Co.*,
    No 85-cv-2989, 1985 U.S. Dist. LEXIS 13475 (S.D.N.Y., Nov. 26, 1985)...........22

*Conopco, Inc. v. May Dep't Stores Co.*,
    46 F. 3d 1556 (Fed. Cir. 1994)........................................................................15, 16

*Dallas Cowboys Cheerleaders v. Pussycat Cinemas, Ltd.*,
    604 F.2d 200 (1979)..............................................................................................18

*Eastern Am. Trio Prods. Inc. v. Tang Elec. Corp.*,
    97 F. Supp. 2d 395 (S.D.N.Y., 2000).....................................................................9

*Empresa Cubana Del Tabco v. Culbro Corp.*,
    No. 97-cv-8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y. Mar. 26, 2004).............19

*First Brands Corp. v. Fred Meyer, Inc.*,
    809 F.2d 1378 (9th Cir. 1987) ..............................................................................10

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997)..................................................................................14

*Gray v. Meijer, Inc.*,
    295 F.3d 641 (6th Cir. 2002) ................................................................................15

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996)....................................................................................19

*Jewelers of Am. v. Amirghanyan*,
    115 F.R.D. 274 (S.D.N.Y., 1987) .........................................................................21

*Louboutin v. Yves Saint Laurent Am. Holding, Inc.*,
    696 F.3d 206 (2d Cir. 2012)....................................................................................8

*Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*,
    206 Fed. App'x 10 (2d Cir. 2006)......................................................................21

*Mana Prods., Inc. v. Columbia Cosmetics Mfg. Inc.*,
    65 F.3d 1063 (2d Cir. 1995)............................................................................9

*McGregor-Doniger Inc. v. Drizzle Inc.*
    599 F.2d 1126 (2d Cir. 1978)..........................................................................16

*McNeil Nutritionals, LLC v. Hartland Sweeteners*,
    511 F.3d 350 (3d. Cir. 2007)............................................................12, 13, 14

*Nabisco, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir. 1999)............................................................................17

*Nora Beverages, Inc. v. The Perrier Grp. of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001)............................................................................12

*In re Owens-Corning Fiberglass Corp.*
    774 F.2d 1116, 1120 (Fed. Cir. 1985)...........................................................10

*Pfizer Inc. v. Perrigo Co.*,
    988 F. Supp. 686 (S.D.N.Y. 1997) ...............................................................16

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)............................................................................11

*Salinger v. Colting*,
    607 F.3d 68 (2d. Cir. 2010)..............................................................................8

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir.1998).............................................................................17

*Total Control Apparel, Inc. v. DMD Int'l Imports, LLC*,
    409 F. Supp. 2d 403 (S.D.N.Y., 2006).........................................................21

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995)..............................................................................21

*Urban Grp. Exercise Consultants, LTD. v. Dick's Sporting Goods, Inc.*,
    No. 12-cv-3599, 2013 U.S. Dist. LEXIS 33270 (S.D.N.Y. Mar. 8, 2013)........9, 10

*Wal-Mart Store, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000).........................................................................................9

*Warner Lambert Co. v. McCrory's Corp.*,
    718 F. Supp. 389 (D.N.J. 1989) ....................................................................15

*Yurman Design, Inc. v. PAJ, Inc.*,
  262 F.3d 101 (2d Cir. 2001)................................................................................................9

**Statutes, Rules & Other Authorities**

15 U.S.C. § 1125(a)(1)(A) ....................................................................................18, 19

Fed. R. Civ. P. 65 ..................................................................................................23

I.      <u>**INTRODUCTION**</u>

Defendants, Harmon Stores, Inc. and Bed Bath & Beyond, submit this brief in opposition to the Order to Show Cause by Plaintiff, It's A New 10, LLC, for a preliminary injunction enjoining the sales of Defendants' HARMON® Face Values™ Instant Therapy leave-in conditioner with keratin (hereafter "Harmon Face Values leave-in conditioner").

This is not the copying case that the Plaintiff makes it out to be.  Rather, this case involves an attempt by Plaintiff through a broad and unwarranted assertion of trade dress allegations to halt the sales of a store brand product carefully designed in its product shape, colors, and labeling to be seen by consumers as a legitimate, lower-priced store brand for Plaintiff's product, and not to be confused with Plaintiff's product.

Plaintiff's product at issue is the miracle leave-in plus keratin haircare product from the "It's a 10" line (hereafter "It's a 10 leave-in conditioner").  The purported product trade dress is a broad claim to a combination of a "unique shade" of blue for the bottle, an orange cap, and a dominant circle design in the center that is blue, orange, and white.  Plaintiff's trade dress claim is both broader than the trade dress used and inconsistent with the way in which these elements appear on its product.  The bottle color is purple, not a unique shade of blue.  It does not have a dominant circle design in the center that is blue, orange, and white; rather, it has a display of the trademark "It's a 10" with the number 10 in a white circle, which is encircled by an orange ring.  And the circle is not centered, but is offset to the left side of the label.

Defendant Harmon Stores are discount health and beauty supplies stores that have offered many store brands under the private label HARMON® FACE VALUE.  When Defendants set out to design a store brand to compete with Plaintiff's product, Defendants were careful to design a label without use of Plaintiff's trademark "It's a 10" and logo, and to use Defendants' own

house brand HARMON® FACE VALUES.  Defendants were also careful to use a different bottle shape and a different color for the bottle — blue in comparison to Plaintiff's purple.

There is no likelihood of confusion between these products.  Indeed, Defendants' products are displayed and sold only in Defendants' Harmon Stores, Christmas Tree Shops, and Bed Bath & Beyond stores, where the two products are placed side-by-side as shown below.  Customers shopping in these stores are conditioned to looking for a HARMON® FACE VALUES store brand compared to a national brand and displayed side-by-side.  They are displayed as follows:



(*See* Kennedy Decl. Exh. B.)

Defendants' product was developed and introduced into the market by October 2015.  It was introduced in 234 stores and has been sold there to the present time.  (Stenger Decl. ¶¶ 4-5.)

During this more than one and one-half years of sales, there has not been even a single reported instance of actual confusion. (*Id.* ¶ 15.)  Indeed, Plaintiff contends that it did not even notice Defendants' product until one month ago, suggesting that no one believed that Defendants' Harmon Face Values leave-in conditioner created enough of an issue for Plaintiff's alleged trade dress to bring the matter to Plaintiff's attention.

Based on Plaintiff's claim to color trade dress, and the long and contemporaneous sales of Plaintiff's and Defendants' products in competition without instances of actual confusion, four conclusions are warranted: (a) Plaintiff's purported trade dress has not acquired secondary meaning and is not protectable; (b) there is no likelihood of confusion between the two product trade dresses; (c) Plaintiff has suffered no irreparable harm since Defendants' sales had not even come to its attention for one and one-half years; and (d) at this stage, the balancing of the equities for a preliminary injunction would favor denial of a preliminary injunction.

## II.  STATEMENT OF FACTS

### A.  Plaintiff Does Not Have Trade Dress Rights To Any Blue Body/Orange Top Bottle With A Circle Design

Plaintiff claims to have trade dress rights in hair care product bottles having a unique shade of blue body, an orange cap, and a circle design with blue, orange, and white.  Thus, Plaintiff describes its alleged trade dress:

> Some of Plaintiff's top-selling products in its vast portfolio of professional hair care products are its keratin line of hair products and the Miracle Shine Spray at issue, herein, which use, among other non-functional elements, a distinctive color scheme of a unique shade of blue for the body of the products, an orange cap and a dominant circle design in the center that is blue, orange and white (hereinafter "It's a 10 Trade Dress").

(Pl.'s Mem. 3 (emphasis added).)  In support of these allegations, Plaintiff shows certain of its products which it claims have these elements. (*Id.* at 1,3).

Plaintiff's alleged trade dress is too broad and inconsistent with its products.  First, the "unique" shade of blue is actually the color purple, as is clear from the container to be submitted to the Court:



(Kennedy Decl. Exh. A.)

Second, the circle design is not in the center, but is offset as part of the trademark "It's a 10."  Moreover the circle design consists of the number 10 in a white circle surrounded by an orange ring:



These trade dress elements are apparent in all products in Image 2.  (*See* Pl.'s Mem. 3.)  Third, plaintiff omits the bottle shape of its Miracle Leave-In Plus Keratin product with which Defendants' store brand was designed to compete.

Defendants' product did not use this distinctive bottle shape, but a different cylindrical bottle shape.

### B.    Defendants Designed Their Store Brand To Avoid Confusion With Plaintiff's Product

Defendant Harmon Stores are discount health and beauty supply stores that have long offered store brands under the store mark or private label HARMON® FACE VALUES™.  These store brands have included over 65 skus for HARMON FACE VALUES hair care products.  (Cirilli Decl. ¶ 5, Exh. A.)  The Harmon stores websites show HARMON FACE VALUES private label brand as a "featured brand."  (*Id.*, Exh. B.)

Defendants set out to create a store brand to compete with Plaintiff's Miracle leave-in plus keratin haircare product from its "It's a 10" line.  In designing the label and bottle for the product, Defendants were careful not to use Plaintiff's trademark and to prominently identify the product as a store brand.  First, in terms of the product container, Defendants used a stock cylindrical bottle, rather than the uniquely shaped bottle for Plaintiff's product.  (*See* Kennedy Decl. Exh. B.)  Defendants also used the color blue for their bottle, noticeably different than what Plaintiff calls the "unique blue" for its bottle, which in actuality is purple.  Plaintiff's 10 oz. product uses a metallic copper cap.  Defendants' 10 oz. product uses a stock orange plastic top.

In terms of the labeling of the container, Defendants were careful to avoid any use of Plaintiff's trademarks.  Defendants used a prominently show the HARMON® FACE VALUES™ private label at the top of its container.  Defendants' design does not use Plaintiff's unique trademark "It's a 10" in a white circle encircled by an orange ring, or any trademark at all similar

to that.  Instead, Defendants use the mark "instant therapy" over an orange circle encircled by a white ring.  To signal to customers that the product is the Harmon store brand, Defendants use the following language at the bottom of the bottle:

Compare Ours to
It's a 10® miracle leave-in
plus keratin*

the star in this notice refers to the note on the back of the container which reads:

*This product is not
manufactured or distributed
by it's a 10® Inc., distributor
of it's a 10 miracle
leave-in plus Keratin.

The labeling of the product refers to the product as "leave-in conditioner with keratin", but each of these words is a generic term for the type of conditioner or a principal ingredient.

### C.    Defendants' Store Brand Has Been Displayed And Sold Throughout Its Stores Since October 2015

While Plaintiff claims to have first become aware of Defendants' products approximately one month ago, Defendants' products have been actively sold in the market since October 2015. Specifically, the HARMON® FACE VALUES™ instant therapy leave-in condition with keratin has been sold in Harmon and Bed Bath & Beyond stores since October 22, 2015.  At the time of its introduction, 234 stores carried the products.  This included stores in the New York metropolitan area and in Florida, where Plaintiff is located.  (Stenger Decl. ¶ 4).  Defendant introduced its HARMON® FACE VALUES™ leave-in conditioner in Christmas Tree Shop stores beginning on April 16, 2016.  (*Id*. ¶ 5.)

For the past 20 months, Defendants' product has been actively sold in at least 234 stores. Over this period of time, Defendants' HARMON® FACE VALUE™ leave-in conditioner with keratin has been sold side-by-side with Plaintiff's "It's a 10" miracle leave-in plus keratin

product.  Defendants have enjoyed significant sales over the past one and one-half years.  (*See* Stenger Decl. ¶ 6.)  And during this time, Defendants have not had even a single reported instance of actual confusion.  (*Id.* ¶ 5.)  Likewise over this time, Plaintiffs have not submitted even a single instance of actual confusion.

While Plaintiff claims that it only learned of Defendants' sales of its products in the past month, Plaintiffs' "It's a 10" products have been sold at Harmon stores dating back to February 2011, and at Bed Bath & Beyond stores dating back to January 2013.  (Stenger Decl. ¶ 7).

### D. Similar Designs For Hair Care Products Are Prevalent

Plaintiff is by no means the only company who has used blue containers, orange tops or circular designs for haircare products.  It is not uncommon for haircare products to be sold in blue containers.  Examples of such products submitted by Ms. Stenger include the following products sold at Harmon Stores: IT brand 12-in-1 Hair Care Treatment;  IT brand 12-in-1 Hair Care Serum;  Blue Chamomile and Argan Oil Hair Conditioner sold under the HASK brand;  Curly Sexy Hair curl conditioner sold under the CURL POWER brand and manufactured by Sexy Hair Concepts;  CATWALK brand hairspray; and ULTRA SWIM brand shampoo. (Stenger Decl. ¶ 11, Exh. B.)

Orange caps are also not uncommon.  The Harmon Stores presently sell the following haircare products with orange caps:  AFRICAN PRIDE brand moisturizer;  CANTU brand shine and hold mist;  CANTU brand moisturizer;  DARK AND LOVELY brand sheen sealing nectar;  DARK AND LOVELY brand shampoo and conditioner;  and RUSK SHINING brand movement myst.  (*Id.* ¶ 12, Exh. C.)

Moreover, containers for haircare products have include use of a circle as an element of brand identification on the front of the container:  the TEA TREE brand of shampoo;  the

TERAX ITALIA brand of conditioner;  and the AWAPUHI brand of shampoo.  (*Id.* ¶ 13, Exh. D.)

## III.   ARGUMENT

### A.   The Preliminary Injunction Standard

The district court may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Louboutin v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012).  In addition, "courts must not simply presume irreparable harm."  *Salinger v. Colting*, 607 F.3d 68, 82 (2d. Cir. 2010).  Rather, "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm."  *Id.*  Finally, the "court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor," and "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction."  *Id.* at 80.

### B.   Plaintiff Is Not Likely To Succeed On The Merits

#### 1.   Plaintiff Does Not Have Broad Trade Dress Rights To A Color Combination

In this action for trade dress infringement, Plaintiff seeks unwarranted and overbroad protection for a combination of a "unique" blue for a container and orange for a top along with a circular design of specified color.  This is not the trade dress used for Plaintiff's products as presented to a customer.  Indeed, Plaintiff has removed various elements of its trade dress, such as the unique bottle shape and the trademark "It's a 10" with design, to try to improve its argument that Defendant's trade dress is confusingly similar.

To establish rights to protect its broadly alleged color combination trade dress, Plaintiff must establish secondary meaning.  Plaintiff has tried to sidestep this entire issue by contending that its trade dress is arbitrary, fanciful and inherently strong so that no secondary meaning needs to be established.  (Pltf. Mem. 10-11).  But Plaintiff's alleged trade dress comes down basically to a combination of colors, and establishing trade dress rights in such a trade dress requires proof of secondary meaning.   The Supreme Court has held that color "can never be inherently distinctive."   *Wal-Mart Store*, *Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 214 (2000).  Accordingly, a plaintiff must establish distinctiveness of a color trademark through a showing of secondary meaning.  *Id.* at 215.  This is true whether the alleged trademark is for a single color or a combination of colors.  *Id.*; *Eastern Am. Trio Prods. Inc. v. Tang Elec. Corp.*, 97 F. Supp. 2d 395, 424 (S.D.N.Y., 2000) (holding that the plaintiff had failed to establish that the "two-tone color combination" of its product had "attained a secondary meaning in the marketplace," so as to be "indicative of the product's source").   In addition, courts have held that it is "particularly difficult to show secondary meaning for a color or color combination."   *Urban Grp. Exercise Consultants, LTD. v. Dick's Sporting Goods, Inc.*, No. 12-cv-3599, 2013 U.S. Dist. LEXIS 33270, at *7 (S.D.N.Y. Mar. 8, 2013)(citing *Mana Prods., Inc. v. Columbia Cosmetics Mfg. Inc.*, 65 F.3d 1063, 1070 (2d Cir. 1995)).

A plaintiff claiming "secondary meaning" must show that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself."  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).  In an attempt to prove secondary meaning, Plaintiff has submitted evidence through the declaration of Carolyn Aronson showing sales, advertising expenditures, references in publications, awards in publications and celebrity endorsements.  (*See* Aronson Decl. ¶¶ 3-12, Exhs. A, B, C.)  However,

as support for a broad assertion of trade dress rights to a blue and orange container with a circular color specific central design, all of this evidence is deficient.  Plaintiff has not separated out its advertising the particular products having its alleged trade dress from the entire It's a 10 line.  (*See* Aronson Decl. ¶¶ 7, 14.)  At best, certain of the submitted ads and publications merely show one or more of Plaintiff's products.  But they in no way tout Plaintiff's alleged trade dress. As the court in *Urban Grp. Exercise Consultants* found:

> While the allegation that "[s]ince 2008, Berns has spent approximately $2.4 million annually in his global advertising expenses for the Urban Rebounder," SAC¶ 23, does address the period of time relevant to this action, that allegation is not supportive of a finding of secondary meaning, because there is no contention that any of those advertisements or promotions stressed or emphasized the alleged trade dress.  *See Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826-27 (Fed. Cir. 1992)

*Id.* at *8-9.  Plaintiff's evidence all fails the test of "image advertising" that stresses the particular trade dress at issue, such as by urging "consumers to look for the 'familiar yellow jug'" suggested in *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987), or through an "extraordinary and intense advertising campaign" featuring the "Pink Panther" to establish trade dress rights in the color of pink for insulation in *In re Owens-Corning Fiberglass Corp.*, 774 F.2d 1116, 1120 (Fed. Cir. 1985).

Moreover, Plaintiff has not submitted a survey or other scientific evidence that its alleged trade dress of a blue and orange container with a central circle design of specified color has become recognized by consumers.  *See Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826-27 (Fed. Cir. 1992):

> Braun proffered no surveys, quantitative evidence or testimony suggesting the existence of secondary meaning as to the blender design.  *American Television and Communications Corp. v. American Communications and Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987) (plaintiff's failure to submit survey evidence of secondary meaning supported finding that none existed); *Investacorp, Inc. v. Arabian Investment Banking Corp.*, 722 F. Supp. 719 723-24 (S.D. Fla. 1989) (plaintiff's failure to provide survey evidence is compelling evidence of no secondary meaning).

In sum, Plaintiff has not shown that is broad alleged trade dress has acquired secondary meaning.

### 2. Defendants' HARMON® Face Values Conditioner Is Not Likely To Be Confused With Plaintiff's Products

Regardless of whether Plaintiff's alleged trade dress has established a secondary meaning, Plaintiff must also show that Defendants trade dress for its Harmon Face Values leave-in conditioner with keratin is likely to confuse consumers.  In this Circuit, the factors to be considered in evaluating evidence as to a likelihood of confusion are the seven factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

Evaluation of the evidence on the Polaroid factors convincingly shows that Defendants private label product does not created a likelihood of confusion.  We focus below on the most important of these factors.

### a. The Differences In The Trade Dresses Of The Products Weighs Strongly Against A Likelihood Of Confusion

On the issue of likelihood of confusion, the Court considers the effects of the packages as a whole.  And it is of great importance to this comparison that one recognize that Defendants' product was designed to be a store brand to compete with Plaintiff's product.

If Plaintiff could establish rights to its alleged trade dress, the Court would compare the two trade dresses on a likelihood of confusion analysis.  This comparison will consider the effect of all elements of the trade dresses as a whole.  As explained in *Beverage Marketing USA, Inc. v. South Beach Beverage Corp.*, 36 Fed. Appx 1214 (2d Cir. 2002):

> In an "action for trade dress infringement each aspect should be viewed in relation to the entire trade dress." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 744 (2d Cir. 1998) ("*Nora I*") (internal quotation marks omitted). That is, in addition to considering individual elements of the packaging, the court should consider "the total package," *i.e.*, "consider the elements for which protection is claimed in the context of the entire trade dress." *Id.*; *see also Nora II*, 269 F.3d at 122 ("appropriate

test for similarity of trade dress is the overall impression of the products and the entirety of the trade dress[;] . . . a mark may not be dissected in order to prove similarity"). The "'presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question . . . can go far towards eliminating any possible confusion.'" *Nora I*, 164 F.3d at 744 (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992)).

*Id.* at 14. Similarly in *Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114

(2d Cir. 2001) the court stated:

[W]e have repeatedly held that the appropriate test for similarity of trade dress is the overall impression of the products and the entirety of the trade dress, and that a mark may not be dissected in order to prove similarity. *See Nabisco*, 220 F.3d at 46-47; *Merriam-Webster*, 35 F.3d at 71-72; *Bristol-Myers Squibb*, 973 F.2d at 1046.

*Id.* at 122.

In this case where buyers typically see the two products side-by-side (Cirilli Decl. ¶ 6), "a

side-by-side comparison may be appropriate." *McNeil Nutritionals, LLC v. Hartland

Sweeteners*, 511 F.3d 350, 359 (3d. Cir. 2007).

The comparison between the two trade dresses shows great and significant differences

that would render confusion entirely unlikely. Rather than being "virtually identical" as Plaintiff

contends, the two trade dresses are noticeably and materially different:

- Defendants' product prominently shows its house brand HARMON® and the

  private label trademark Face Values™ that have been used for many store brands

  at Defendants' stores.

- The HARMON® satisfaction guarantee seal is prominently displayed on the back

  of the container and the product is noted as "distributed by Harmon Stores, Inc."

- Whereas Plaintiff's trade dress shows the "It's a 10" mark with the "10" in purple

  on white background and encircled by an orange ring, Defendants' product uses

the mark "Instant Therapy" in white lettering over an orange circle encircled by a white ring.

- Whereas Plaintiff's trade dress includes a uniquely shaped bottle, Defendants' trade dress uses a different cylindrically shaped bottle, standard in the industry.

- Whereas Plaintiff's bottle uses a "unique blue" that appears as purple, Defendants' bottle is a lighter shade of blue.

- To emphasize that it is a store brand, at the bottom, Defendants' label states:

<div align="center">

Compare Ours to
it's a 10® miracle leave-in
plus keratin*

</div>

The star refers to a note on the back reading:

<div align="center">

*This product is not
manufactured or distributed
by it's a 10® Inc., distributor
of it's a 10 miracle
leave-in plus Keratin.

</div>

- The labeling of both products as "leave-in" conditioner is use of a generic term for hair conditioner.  Also the labeling as including "keratin" specifies a principal ingredient by its generic name and is common for other haircare products containing keratin.

(Stenger Decl. ¶ 8, Exh. A)

The use of the HARMON® FACE VALUES store brand name and the different product trademarks used by Defendants in comparison to Plaintiff's "It's a 10" mark are particularly significant because Defendants' product is a store brand.  In *McNeil Nutritionals*, *supra*, the Third Circuit found that store brands by Food Lion and Safeway for the well-known SPLENDA, artificial sweetener did not infringe the trade dress of SPLENDA because the packages in

question (a) did not use a mark confusingly similar to SPLENDA, and (b) used the name and logos of the respective stores to be identified as store brands.  The court relied on the purpose and practices for store brands that are relevant in the present case:

> Store brands are typically found on store shelves next to the analogous national-brand products.  The packaging of store-brand products often includes reference points to invite the consumer to compare them to the national-brand ones.  These reference points often include similar product packaging and "compare to" statements on the packaging.  Stores also employ tags on store shelves (so-called shelf extenders or shelf talkers) that explicitly invite consumers to compare the store-brand product with the national-brand analog.

> Consumers are generally aware of the name of the store in which they are shopping.  They are aware that stores have private-label brands that in most cases are merchandised next to the national-brand products.  Prices for the products are typically displayed prominently.  Consumers can, therefore, see the cost difference between store brands and national brands.

*Id.* at 353-54.

As to the comparison of the "overall impressions" created by the two trade dresses, the Third Circuit noted that "the most important difference is that the trade name 'Splenda' is not present, but the name and logo of the respective stores are."  *Id.* at 360.  The court explained that "the prominent presence of another well-known word or design mark might be sufficient" to cure an otherwise infringing trade dress, citing *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997), among other authorities.  The court found that the "Food Lion" and "Safeway" marks would be considered well-known "because they are well-known to the consumers who shop in the stores with those same names."  *Id.* at 361.  The same is true for Defendants HARMON® FACE VALUES store brand.  The court also found additional differences in the trade dress from the fact that the Food Lion product name was "Sweet Choice" not "Splenda", and it was not surrounded by a white cloud as Splenda was.  *Id.* at 361-62.  Likewise here Defendants' label does not use a mark similar to the "It's a 10" mark or the white circle background for the number 10, but instead uses the name Instant Therapy on the label.

Other courts have found that store brands that distinguish their product by the display of the store brand and different logos from the national brand do not infringe trade dress rights. In *Conopco, Inc. v. May Department Stores Co.*, 46 F. 3d 1556 (Fed. Cir. 1994), the Federal Circuit found that store brands by May Department stores for the VASELINE intensive care products did not infringe the Plaintiff's trade dress. In reversing the trial court on likelihood of confusion, the court found the most significant factor to be the "black and white diagonally-striped Venture logo prominently situated on the front of the original and relaunched Venture products." *Id.* at 1566. The court reviewed the significant authority finding that the prominent placement of the party's names on their respective packages may be sufficient to avoid trade dress infringement. *Id.* at 1568-1570. These authorities included *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389 (D.N.J. 1989), in which a store brand for Listerine mouthwash was held not to create a likelihood of confusion. There, the court noted:

> [T]he price difference between the two products is not only a product difference in itself, but also prompts [defendant] McCrory to bring this price difference to the consumers attention through the prominent use of "compare and save" signs on shelves in which the products appear, further distinguishing the two products from each other in the minds of prospective consumers. The Court also takes cognizance of the fact that a McCrory's shopper, as with any shopper in such a retail store chain, has likely been exposed to generic or house brands before, and when walking through a McCrory's store and observing the many "compare and save" signs, is not likely to misled by the McCrory's mouthwash brand.

*Id.* at 398-99.

Similarly in *Gray v. Meijer, Inc.*, 295 F.3d 641, 648 (6th Cir. 2002), the court upheld a finding of no likelihood of confusion for a store brand of popcorn noting:

> Importantly, as the district court also noted, the fact that the Meijer bag "prominently displays the 'Meijer' mark and that its design is consistent with its other private label brands would lead a consumer to believe that the product is a private label snack, not a product manufacturers by the Grays."

*Id.* at 648.

Moreover, the side-by-side presentation of Plaintiff's and Defendants' products reduces the likelihood of confusion possibility.  *See Pfizer Inc. v. Perrigo Co.,* 988 F. Supp. 686, 699 (S.D.N.Y. 1997) (holding that since the products were sold next to each other, "it is unlikely that the consumer would be confused into believing that he or she was buying one product when she actually was buying the other");, *Conopco,* 46 F.3d at 1563-64 (Fed. Cir. 1994) (holding that where a "national brand is being sold side-by-side with the private label brand, the assumption [that a national brand manufacturer would be the source of the competing private label brand product] is at best counter-intuitive").

> **b.     The Absence Of Actual Confusion Despite One
> And One-Half Years Of Contemporaneous Display
> And Sale Weigh Strongly Against A Likelihood Of Confusion**

The fifth Polaroid factor, evidence of actual confusion, is also important here.  While an absence of actual confusion for a product just entering the market might be meaningless, in this case, Defendants' Harmon Face Values leave-in conditioner with keratin has been sold side-by-side with Plaintiff's product in Defendants' stores since mid-October 2015.  If there were a likelihood of confusion, one would have expected evidence of actual confusion to have come to light.  It has not.  Plaintiff has reported no instance of actual confusion.  Furthermore, Defendants are unaware of any such instance of actual confusion.  (Stenger Decl. ¶ 15.)

Given that both the Defendant's and Plaintiff's products have both been available for a substantial period of time, the absence of a likelihood of confusion may be inferred from the lack of actual confusion.  *McGregor-Doniger Inc. v. Drizzle Inc.* 599 F.2d 1126, 1136 (2d Cir. 1978); *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975) (holding that "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion").  "If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual

confusion is detected either by survey or in actual reported instances of confusion that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999).  Thus, "evidence of actual consumer confusion is particularly relevant to a trademark infringement action." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir.1998).

<div align="center">

**c.     Defendants' Intent Was To Create
A Store Brand, Not To Cause Confusion**

</div>

Plaintiff argues that Defendants intent in adopting its trade dress was to gain an unfair commercial advantage by intentionally copying Plaintiff's trade dress.  (Pltf's. Mem. 12-13.) However, Plaintiff entirely misses the point of the many cases dealing with store brands that there is nothing wrong with a competitor designing a store brand that will be compared to the national brand, so long as it is not confused as to source with the national brand.  (Cirilli Decl. ¶¶ 4-6.)  That was clearly the mission of Defendants in creating the trade dress for its product. To that end, Defendants' product is labeled as a "compare to" product.  (Stenger Decl. ¶¶ 8-10.) However, as for the many cases cited above regarding store brands, this is an acceptable commercial practice.   Harmon Face Values leave-in conditioner with keratin prominently displays its store brand HARMON® FACE VALUE and does not use Plaintiff's mark 'It's a 10' and logo, rather uses the name "instant therapy."

<div align="center">

**d.     Plaintiff's Alleged Trade Dress Is Not A Strong Mark**

</div>

Plaintiff's alleged trade dress in the blue and orange color combination along with a central, circular, color specific design is not strong.  The sales, advertising and publicity are not shown to have been directed to promoting what Plaintiff claims to be its trade dress.  At best, certain of the ads show a bottle of the product, but do not point out the blue and orange combination or the color specific circular design to plaintiff as being unique .

Moreover, there are many other haircare products using blue bottles and having various circular designs in the center of the bottle.  Ms. Stenger of Defendants has identified a number of such products which are available in the Harmon stores.  (Stenger Decl. ¶ 11, Exh. B.)

<div align="center"><strong>e.      Defendants' Product Is Of A High Quality</strong></div>

The final Polaroid factor relates to the quality of Defendants' product.  In this case, Plaintiff puts in no evidence to establish that Defendant's product is not of high quality.

<div align="center">* * *</div>

In conclusion, in balancing the evidence on the Polaroid factors, one must conclude that there is no likelihood of confusion.  Of considerable importance are the presence of the HARMON® store name, the Face Values™ trademark, the other labeling differences between the products, and the absence of any actual confusion despite more than one and one-half years of side-by-side display and sales.

<div align="center"><strong>3.      Plaintiff Cannot Establish Confusion As To Association</strong></div>

In support of its motion, Plaintiff also makes a perfunctory argument that Defendant's products are likely to create a "false association" with Plaintiff under 15 U.S.C. § 1125(a)(1)(A).  (Pltf's. Mem 13-14.)  In particular, Plaintiff states that § 1125(a)(1)(A) provides for a "statutory intent to create a remedy for confusion as to 'association' separate from and in addition to the remedy of confusion as to 'origin, sponsorship or approval.'"  *Id.*  However, Plaintiff is unable to cite any case law in which a court has identified "confusion as to association" as creating a separate remedy from "confusion as to origin, sponsorship, or approval."  In fact, the only decision that Plaintiff cites in connection with its assertion of § 1125 is *Dallas Cowboys Cheerleaders v. Pussycat Cinemas, Ltd.*, 604 F.2d 200, 204-05 (1979), which based its holding on "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark."

In addition, Plaintiff has failed to establish how "confusion as to association" could exist with respect to Defendant's products absent a likelihood of confusion as to the source of Defendant's products.  As set forth above, Plaintiff has not established a likelihood of confusion as to source.  Accordingly, Plaintiff has failed to set forth a likelihood of success under 15 U.S.C. § 1125(a)(1)(A) for false association.

**4.     Defendants Have Not Violated The New York Anti-Dilution Statute**

Recognizing that its case on establishing trade dress infringement is not strong, Plaintiff contends that Defendants' conduct violates the New York anti-dilution statute.  Plaintiff argues that its trade dress does not have to have achieved national fame nor does it need to prove a likelihood of confusion.  Rather, it needs to show only that Defendants' conduct is likely to dilute the distinctive quality of Plaintiff's trade dress.  (Pltf's. Mem. 14-15.)

The claim under the New York anti-dilution statute requires two elements:  (1) ownership of a distinctive mark, and (2) a likelihood of dilution.  *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996).

Plaintiff fails under the first element because it has not shown that its alleged trade dress is protectable or that it has acquired secondary meaning.  Thus, Plaintiff fails to show that its broad color combination trade dress is an extremely strong mark.  Although Plaintiff may not have to show national fame, it would need to show something very close.  In *Empresa Cubana Del Tabco v. Culbro Corp.*, No. 97-cv-8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y. Mar. 26, 2004), the court rejected the argument that Plaintiff makes here:

> Cubatabaco argues that a mark need not be famous in order to make out a dilution claim under New York law.  In support Cubatabaco cites *Welch Allyn, Inc. v. Tyco Int'l Servs. AG*, 200 F. Supp. 2d 130, 150 (N.D.N.Y. 2002), which adopts that proposition. However, *Welch Allyn* also states that "the New York anti-dilution statute 'protects only extremely strong marks.'"  *Id.* (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F. 2d 621, 625 (2d Cir. 1983).)   The case law on the standards for establishing the distinctiveness required to show dilution under New York law closely resemble the

standards for fame under the FTDA.  *See Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989) (mental association between marks required to show distinctiveness "may be created where the plaintiff's mark is very famous and therefore has a distinctive quality for a significant percentage of the defendant's market.")  In *Sally Gee*, the Second Circuit in dicta interpreted extremely strong marks as applying only to the "most well-known names."  699 F.2d at 625 (quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y. 2d 538, 548, 399 N.Y.S. 2d 628, 369 N.E. 2d 1162 (1977) (Cooke, J. dissenting) (interpreting the majority opinion)).  The legislative history for New York's anti-dilution statute cites the same very famous hypothetical misappropriations of trademarks as does the federal legislations:  "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns and so forth," *Mead Data*, 875 F.2d at 1031 (quoting 1954 N.Y. Legis. Ann. 49-50) suggesting that only highly recognizable marks merit protection.  *See also id.* at 1033 (Sweet, J., concurring) (noting that the majority's conclusion "limits section 368-d's protection to nationally famous marks.")

*Id.* at *156-58.  In sum, Plaintiff must establish that its trade dress is highly recognizable and very strong to be protectable under the New York anti-dilution statute.  Plaintiff has no such evidence.

Plaintiff also fails under the second element because it makes no attempt to establish that Defendants' conduct causes a likelihood of dilution.  Indeed, Plaintiff has not even articulated how such dilution could occur, even though Defendants' product has been on the market for more than one and one-half years at numerous stores.

### C.   Plaintiff's Unreasonable Delay Undermines Its Contention of Irreparable Harm

As noted above, Plaintiff must establish the existence of irreparable harm to be entitled to a preliminary injunction.  To establish irreparable harm, Plaintiff argues only that there is a presumption of irreparable harm from a finding of likelihood of confusion and that the alleged infringement would cause inevitable injury to Plaintiff's goodwill developed in association with its trade dress.  (Pltf's. Mem. 15-16).

Plaintiff's contention of irreparable harm is entirely rebutted by the fact that Defendants' product in its present trade dress is on the market in 283 of Defendants' store locations displayed

side-by-side with Plaintiff's product beginning in October 2015. Thus, consumers have been confronted with these exact trade dresses for more than one and one-half years. Yet, during this entire period of time, there has been no reported instance of actual confusion.

Plaintiff contends that it "learned on or about May 26, 2017" that Defendant "began selling" the accused products. (Pltf's. Mem. 1.) However, Defendants' Harmon Face Values leave-in conditioner with keratin have been on sale in Defendant's numerous store locations since at least October 22, 2015. (Stenger Decl. ¶ 4.) Accordingly, Defendant's products have been sold side-by-side with Plaintiff's products for over one and one-half years, yet Plaintiff now claims that it will suffer irreparable harm if Defendant's products are not immediately taken off the shelves. Plaintiff's delay in bringing its motion for preliminary relief undermines its argument that it will be subject to irreparable harm if its motion is not granted. *Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*, 206 Fed. App'x 10, 12 (2d Cir. 2006)(stating that "Appellants' arguments for preliminary relief are undermined, moreover, by their delay in bringing this action, which casts doubt on their claim of irreparable injury"); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)(holding that "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury").

Even if one accepts Plaintiff's contention that it did not learn of Defendant's product until a month ago, Plaintiff's delay is unreasonable, given that Plaintiff should have known of Defendant's products long before it brought this motion. *Total Control Apparel, Inc. v. DMD Int'l Imports, LLC*, 409 F. Supp. 2d 403, 408 (S.D.N.Y., 2006)(holding that the plaintiff knew or "should have known" that the defendant was producing and selling the accused products well before bringing the motion for preliminary injunctive relief); *Jewelers of America v.*

*Amirghanyan*, 115 F.R.D. 274, 276 (S.D.N.Y., 1987) (holding that the plaintiff "knew or should have known" of the defendants allegedly infringing activities at least nine months prior to bringing the action): *Calvin Klein Co. v. Farah Manufacturing Co.*, No 85-cv-2989, 1985 U.S. Dist. LEXIS 13475, at *38 (S.D.N.Y., Nov. 26, 1985) (holding that plaintiff "knew or should have known long before it brought this suit" of defendant's alleged activities).

Plaintiff surely knew that Defendants were selling the It's a 10 brand haircare products at Defendants' stores, considering the prominence of the Bed Bath & Beyond and Harmon stores. Indeed, Harmon began selling Plaintiff's products in dispute no later than October 2011, and Bed Bath & Beyond began selling Plaintiff's products in dispute no later than February 2014. (Stenger Decl. ¶ 6.)  Thus, Plaintiff would have comparatively shopped Defendants' stores since this time and could or at least should have been aware of Defendants' sales of Harmon Face Values leave-in conditioner from October, 2015.

>    **D.    The Injury To Defendants From An Injunction**
>    **Outweighs Any Injury To Plaintiff From Denial Of An Injunction**

Preliminary injunction would cause Defendants immediate and substantial harm.  For the past year and one-half, Defendants have established a business in association with its store brand. Defendants' investment has included the expenditures in designing and producing its product, the manufacture, shipment and distribution of the product into Defendants many store locations. The display of the product and a significant sales commitment to the product.  An injunction at this stage would cause severe injury to Defendants' business innocently built up over the past year and one-half.  (*See* Cirilli Decl. ¶ 7; Stenger Decl. ¶ 16.)

In comparison, Plaintiff has no real injury.  Plaintiff contends that there would be injury to its goodwill.  However, Plaintiff has not submitted any concrete evidence that Defendants Harmon Face Values leave-in conditioner product has caused any confusion in the marketplace

over the past one and one-half years.  Indeed, the *status quo* in this case that has subsisted over the past one and one-half years is the presence of Defendants' product in the market. Accordingly, an injunction in this case would actually upset the *status quo*.

      E.      **The Public Interest Would Be Adversely Affected By An Injunction**

The public interest favors competition.  In particular, the public interest favors lower price store brands, as set forth the authority discussed above.  Thus, a preliminary injunction in this case would be against the public interest because it would remove a legitimate lower- priced store brand from the market without any proof that it has caused confusion with Plaintiff's products.

      F.      **If A Preliminary Injunction Is Entered,**
                   **Plaintiff Must Post A Substantial Bond**

If the court grants Plaintiff's request for a preliminary injunction, Plaintiff must post a bond for the payment of costs and damages as may be incurred an suffered by any party who may be found to have been wrongfully enjoined.  Fed. R. Civ. P. 65.  Defendants have a considerable inventory of products.  In addition, having products removed from the shelf would cause both a significant and substantial disruption to Defendants' business and would cause Defendant to have to incur significant costs.  (Stenger Decl. ¶ 16; Cirilli Decl. ¶ 7.) Thus, Defendants submit that Plaintiff would have to post a bond in the full amount covering Defendants' inventory, Defendants' product in the stores, and the cost which Defendants would incur in having to remove product from stores.

**IV.**     <u>**CONCLUSION**</u>

For all of the foregoing reasons, the court should deny Plaintiff's motion for preliminary

injunction.

<div style="margin-left: 50%;">

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:     908.654.5000
Fax:     908.654.7866
*Attorneys for Defendants Harmon Stores,
Inc. and Bed Bath & Beyond*

</div>

Dated: July 23, 2017                      By: ___ s/Charles P. Kennedy _____
<div style="margin-left: 50%;">

Charles P. Kennedy
Tel:     908.654.5000
E-mail:ckennedy@lernerdavid.com
        litigation@lernerdavid.com

</div>